IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Jualynn Kirkel & Kevin Ameriks, )  11 B 47270
                                 )  Chicago, Illinois
                                 )  10:00 a.m.
                      Debtor.    )  April 02, 2013


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE TIMOTHY A. BARNES


APPEARANCES:

For Debtors:                    Mr. John Cloutier;

For Bridgeview Bank Group:      Mr. Adam Rome;



Court Reporter:         Jackleen DeFini, CSR, RPR
                        U.S. Courthouse
                        219 South Dearborn
                        Room 661
                        Chicago, Il.  60604.

```
 1              THE CLERK:  Jualynn Kirkel and Kevin

 2    Ameriks.

 3              MR. CLOUTIER:  Good morning, Your

 4    Honor.  John Cloutier on behalf of the debtor.

 5              MR. ROME:  Adam Rome on behalf of

 6    defendants.

 7              MR. CLOUTIER:  We're here on my notion

 8    to reopen the case so that I can present a motion to

 9    alter or amend the February 6th order which allowed

10    in part and denied in part my motion for sanctions.

11              THE COURT:  I took a look at this and

12    I took a look at the response.  There's a couple of

13    issues that I have, and one of them was pointed out

14    in the response, which was you allege that there are

15    issues with the previous order, but you don't say

16    what they were.  So, a general allegation of issues

17    is not sufficient cause.  Tell me what it is

18    specifically that you are alleging was incorrect in

19    the previous order.

20              MR. CLOUTIER:  Well, I also filed the

21    motion, it's in there, but I believe there's several

22    errors in the decision.  Post-discharge reaffirmation

23    agreements are not allowed at all.  There's a lot of

24    case law on that.  So any actions to collect is a

25    violation, any of the communications to try and
```

1  collect a discharged debt, even if it's via a

2  reaffirmation agreement after the discharge is not

3  allowed.

4              The bank, in their affidavit, have

5  stated that they had tried to work out a

6  reaffirmation agreement and then the attorney for the

7  debtor was not returning their phone calls; that they

8  talked to him up to the day the discharge was

9  entered, and then were not able to work out an

10  agreement.  He wouldn't return their calls after

11  that, so they contacted the debtor directly.  They

12  bypassed the attorney.

13              And then that's how I got brought into

14  the case, they scared her.  She contacted me.  I

15  believe that's all part of the violation.

16              I would like to present my motion to

17  reconsider the ruling of February 6th.

18              THE COURT:  I don't see an error by

19  the court.  I see what you're saying, that you don't

20  agree with what the court ruled.  That's what you're

21  saying.  That's not an error and does not give you

22  cause to seek reconsideration.

23              MR. CLOUTIER:  I think the error is

24  that the court ruled that the communication was not

25  a -- after the discharge, was not a violation.  And I

1  believe under the case law, any communication to --

2  in an attempt to collect a discharged debt is a

3  violation.  So I believe there was an error by the

4  court.

5          THE COURT:  I'm sorry, but didn't the

6  court find there was in fact a violation under the

7  order?

8          MR. CLOUTIER:  It found a violation in

9  their foreclosure filing of having a clause in there

10  that may have allowed them to seek a deficiency

11  judgment against the debtor.  It did not find there

12  was any violation in their communications to try and

13  collect the discharged debt on the condominium.

14          THE COURT:  So, counsel, what do you

15  do with the allegation of the creditor that this is

16  just simply a delaying tactic?

17          MR. CLOUTIER:  What do I do with that?

18          THE COURT:  Yes.

19          MR. CLOUTIER:  Well, I think that -- I

20  mean, here we have a person who is making their

21  payments.  And I think if they weren't going through

22  this route of theirs to try and get the discharged

23  loan paid, that they would not be going through this

24  course of action.  And so I think the violation was

25  leading up to -- is causing -- their motivation in

1  doing the violation is causing them to take other

2  steps to try and make their threat more credible.  I

3  think it's all just one big --

4            THE COURT:  Is the bank right now able

5  to execute upon its security interest while this is

6  taking place?

7            MR. ROME:  Yes, the bankruptcy hasn't

8  been reopened, Judge.  There's no adversary.  We've

9  been through all this.  The reaffirmation that his

10 client -- I mean, there was -- his client said she

11 wanted to -- not rejected that, but wanted to

12 reaffirm the debt.  The box was checked.  We went

13 through a whole hearing on this.  There's no new law;

14 there's no new facts.  Counsel sent me an email and

15 told me they're not going to allow us to foreclose on

16 this property one way or another.  We're allowed to

17 foreclose.  We're not doing this to do anything else.

18 We're not trying to collect on a debt.  We are

19 foreclosing against the property.

20           THE COURT:  I agree with that,

21 counsel.  What I'm trying to find out is is this a

22 tactic to stop you from the foreclosure.

23           MR. ROME:  Absolutely, Judge.

24           THE COURT:  And the question is how is

25 it stopping you from --

1              MR. ROME:  Well, if the bankruptcy is

2    open, then we have to come back in front of Your

3    Honor to lift stay or -- or -- I guess have the stay

4    modified.

5              THE COURT:  All right.  Let me ask the

6    debtor's counsel.

7              Why is it that this motion is

8    presented so late?  You filed the motion and you

9    scheduled it five weeks out.  That appears to support

10   what counsel is saying, that this is a delaying

11   tactic.

12             MR. CLOUTIER:  Well, as I explained

13   before, I don't do a lot -- practically no bankruptcy

14   stuff, so I am not in a hurry to do things too

15   quickly because it does tend to make mistakes.

16             THE COURT:  Right, but do you

17   understand it's not the filing of the motion, it's

18   the scheduling of the motion.  What you have done is

19   you filed the motion, you scheduled a hearing five

20   weeks after you filed the motion.  That on its face

21   appears to be a delaying tactic.

22             MR. CLOUTIER:  Well, I mean -- I mean,

23   if the motion is granted, the case is reopened.  I

24   mean, I'm expecting them to want to make a response

25   to my motion.  And I believe there will be time --

1           MR. ROME:  We already filed our

2    objection as soon as we got it, and there's nothing

3    here to respond to.  There's no new law; there's no

4    new facts.  He just says he wants the bankruptcy

5    opened.  Sent me an email telling me under no

6    circumstances, I'm paraphrasing, will he allow the

7    foreclosure to go forward.  I don't know what grounds

8    he has not to allow the foreclosure to go forward.

9           There's no grounds to reopen her

10   bankruptcy.  This issue has been handled and Your

11   Honor heard briefs and heard oral argument and ruled.

12           MR. CLOUTIER:  But I think the whole

13   purpose behind their -- from the time they first

14   contacted her and brought her in was to try and get

15   the discharged debt repaid, and this is just them

16   backing up their threat.

17           THE COURT:  All right.  So here's

18   where we are, I'm not hearing this again on the

19   merits.  The issue is very clear to me that this is

20   in fact -- I have heard nothing compelling here that

21   this is anything other than a delaying tactic.

22           The local rules of bankruptcy

23   procedure require that every motion must be presented

24   within 30 days.  That's local bankruptcy rule

25   9013(E).  This motion was presented more than 30 days

1   after the filing of the motion.  Local bankruptcy

2   Rule 9013-(1)(G) states that the court in its

3   discretion may deny any motion that does not comply

4   with local Bankruptcy Rule 9013-(1)(E).

5              The motion is denied for failure to

6   comply with the local rules.

7              MR. ROME:  Judge, he filed a while

8   back a motion for May 7th and for May 9th.  May we

9   have those stricken as well?

10             THE COURT:  They're all stricken.

11             (Which were all the proceedings had in

12             the above-entitled cause, April 02,

13             2013, 10:00 a.m.)

14   I, JACKLEEN DE FINI, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
15   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.

16

17

18

19

20

21

22

23

24

25

Case 1:13-cv-03921 Document #: 5-35 Filed: 05/28/13 Page 9 of 54 PageID #:415
Case 11:43-cv-003921 Document #: 5-35 Filed: 05/28/13 Page 97 of 452 PageID #:415

Document     Page 1 of 46

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUALYNN KIRKEL,                          )   No. 11 B 47270
                                         )   Chicago, Illinois
                                         )   1:30 p.m.
                            Debtor.      )   February 6, 2013

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE TIMOTHY A. BARNES

APPEARANCES:

For The Debtor:                      Mr. John Cloutier;

For Bridgeview Bank Group,
Kevin Ameriks, and Josh Grossman:  Mr. Adam Rome;

Court Reporter:                      Nicole Abbate, CSR
                                     U.S. Courthouse
                                     219 South Dearborn
                                     Room 661
                                     Chicago, IL  60604.

1            THE CLERK:  Taking up the court's 1:30

2    matter, Jualynn Kirkel and Kevin Ameriks.

3            MR. CLOUTIER:  Good afternoon, Your

4    Honor.  John Cloutier on behalf of the debtor,

5    Jualynn Kirkel.

6            MR. ROME:  Good afternoon, Your Honor.

7    Adam Rome on behalf of the defendants.

8            THE COURT:  Bridgeview Bank Group?

9            MR. ROME:  Bridgeview Bank Group.

10   There's Kevin Ameriks and Josh Grossman.

11           THE COURT:  Okay.

12           MR. CLOUTIER:  We're here on my motion

13   for sanctions for the 362 violation and the 524

14   violation.

15           THE COURT:  All right.  So help me out

16   procedurally.  Which is I know that I -- I enter

17   orders with respect to these matters and have parties

18   submit various things.  And I'm not certain that the

19   parties had made today an evidentiary hearing, or

20   whether they made today a day for argument or if

21   they're waiting for the court to set it for another

22   date.  So I wanted to know where we are.  Because I'm

23   prepared to do any and all.  I've been through all

24   the documents.  I've read everything.  I've looked at

25   the evidence.

1              MR. ROME:  Your Honor, you had

2    suggested that if there was a need for an evidentiary

3    hearing after looking at the affidavits, you would

4    require one.  However, you set this day for argument

5    and then indicated there might be a chance, after you

6    went through the documents, that you would ask for an

7    evidentiary hearing.

8              THE COURT:  All right.  Well, I'll

9    tell you right now that unless anything in the

10   argument changes my mind, I don't see a need for

11   further evidence.  I've reviewed the evidence

12   submitted by both parties.  And I am - I find that it

13   is sufficient for the court to rule on the issue.  As

14   to arguments, however, I am prepared to hear argument

15   from the parties.  And in that set of circumstances,

16   I would hear first from the movant.

17             MR. CLOUTIER:  Thank you.  Well, first

18   of all what happened in this case was on

19   November 22nd, 2011, the debtor, Jualynn Kirkel,

20   filed a Chapter 7 bankruptcy proceeding.  At the

21   time, she had two loans with Bridgeview Bank.  One

22   was a second mortgage on a condo that she lived in

23   and the other one was a second mortgage on a

24   commercial building that she also owned.

25             There were negotiations between the

1  attorneys, Ms. Kirkel's attorney and the bank's

2  attorney, about a reaffirmation, but no agreement was

3  ever reached.  During the course of the bankruptcy

4  proceedings, the bank -- I don't know if they began

5  or continued to take payments for the condo out of

6  the -- out of her bank account.

7          Later on, after the discharge, they

8  were still taking the payments out.  She told them to

9  stop.  They refused, and she had to close her account

10 to keep them from continuing to take the money out.

11 In February of 2012, before the discharge was

12 received, Nerma Bajramovic, one of the vice

13 presidents of the bank, called Ms. Kirkel in to come

14 talk about the bankruptcy in progress.  This was

15 while the bankruptcy was in progress.  It was not a

16 discharge yet.  It should have been -- if there were

17 discussions to be had, it should have been with her

18 attorney and not with her directly.  So that's a 362

19 violation.

20          Ms. Kirkel went to the meeting.  She

21 explained to them that she was going to let the condo

22 go, but was going to keep payments on the -- going on

23 the commercial property, which she had continued to

24 make.  At the meeting, she was told that either she

25 was going to have to reaffirm the debt on the condo,

1  or at least part of it.  They said they wanted

2  $50,000 or they would foreclose.  She thought it was

3  an empty threat because she'd had the loan for a long

4  time and had always made her payments, never late on

5  it.  So she didn't think it was a real threat.  Plus,

6  they were receiving a good interest rate, over

7  seven percent.  And the meeting ended with them

8  saying she had to pay something on the condo loan.

9  On March 7th, 2012, she did receive a discharge.

10 There was no reaffirmation on either loan.

11             Shortly after that, she ran into the

12 president of the bank, Suellen Long, at the nail

13 salon, and was told that she needed to come in to

14 discuss the Sheridan condo loan.  I guess Ms. Long

15 told her she was going on vacation so make an

16 appointment after she came back.  I guess they met on

17 March 27th, 2012, along with the VP, Nerma

18 Bajramovic, and she was again told that she had to

19 pay something on the now discharged condo loan.  And

20 that's a 524 violation.  They said if there was no

21 payment, no reaffirmation on the condo loan, they

22 would foreclose, even though the loan was current.

23 And at this point then she started to believe they

24 were really serious.  They gave her the bank's

25 lawyer's phone number, Josh Grossman.  In Ms. Long's

1   affidavit, she said that Ms. Kirkel gave them my

2   information.  I don't know how it was possible

3   because she didn't learn of my existence until after

4   the meeting when she called one of my clients who

5   then referred me to her -- or her to me.  And we've

6   got the phone records to back that up, although that

7   was not part of the evidentiary statement.  She

8   called me that day.  I listened.  I told her I didn't

9   know much about bankruptcy.  You know, I handle

10  foreclosure matters, and that was about it.  About a

11  12-minute conversation.

12             Again, on April 2nd of 2012 at 3:32

13  she called me, so I was in the area, so I met with

14  her.  She showed me the discharge and told me the

15  threats to foreclose and that the bank was saying

16  that she needed to get a lawyer and contact their

17  lawyer.  So at 4:39 that day, I called Josh Grossman,

18  who confirmed what she said, that the bank was

19  demanding 55 percent reaffirmation of the condo loan

20  or they were going to foreclose on the commercial

21  loan.  I told him my understanding of bankruptcy was

22  that they couldn't link the two.  And he said that he

23  had case law.  Not being a bankruptcy attorney I, you

24  know, gave him the benefit of the doubt that he had

25  the case law, but it was a short conversation.  He

1  had to go so he called me the next day.  He called me

2  the next day at 3:07 and again told me the 55 percent

3  reaffirmation, but that they were open to offers.  He

4  said the case -- he told me that the case law allowed

5  them to link the two together and that he would send

6  me the case law.  And on that assumption, that he was

7  telling me what was true, I then talked about, well,

8  maybe we can, you know, make everybody happy and put

9  some deal together.  The people who referred her to

10  me are experienced foreclosure buyers.  Maybe the

11  bank has something they want to get rid of and we can

12  do something to make everybody happy.  But it was not

13  me that approached them about the trying to negotiate

14  a deal.  My calling them was in response to their

15  demand to either -- to her to reaffirm or they would

16  foreclose.  After that, I started researching the

17  issue about whether they can do this kind of thing.

18          It looks like on the 12th of April, I

19  responded to a message left.  I told them I needed

20  another week to review the law.  On the 13th of

21  April, Mr. Grossman, the bank's attorney, in-house

22  counsel I guess, said that -- he sent an e-mail,

23  which is part of the evidentiary statement.  He said

24  that he wouldn't file a foreclosure complaint but

25  could not guarantee that he could give me a full

1   week.  He said to talk to Kirkel, see if a settlement

2   could be reached.  And it was clear, you know,

3   reaffirmation or foreclosure.  He said he was still

4   looking for the case law at that time.

5               I wanted some kind of record of the

6   discussions, so I sent him an e-mail, which basically

7   was a memorandum of our discussions.  I pointed out

8   that he was telling me that if Ms. Kirkel did not

9   agree to reaffirm the condo loan or a percentage of

10  it that they would foreclose, that the bank wanted 55

11  percent, which I calculated to be about $50,600.  I

12  said that as I said in the first conversation, I have

13  little bankruptcy experience.  Their demand to

14  reaffirm or they would foreclose on the other

15  property did not seem to fit the bankruptcy law.  I

16  talked about the standard should be commercially

17  reasonable and that it was improper, in my opinion,

18  to link the two.  And since she was just coming out

19  of bankruptcy, where would she get the 50,000.  I

20  said, well, maybe ten percent would be appropriate

21  for in order not to receive further threats, along

22  with a possible refinance to amortize the loan.  Four

23  and a half percent over 20 years is what I mentioned.

24  I also pointed out that Ms. Kirkel was very upset

25  because of the demands, was having trouble sleeping

1   and was basically in a panic.  I never got any
2   response saying there was anything incorrect from my
3   statements.
4                On April 19th, 2012, Mr. Grossman sent
5   his case law to me that he said backed up his
6   position and that they could link the two.  Their
7   case law was Jamo, which talks about during a
8   bankruptcy proceeding, during the discharge, the two
9   may be linked.  But other -- it doesn't say anything
10  about after.  It also talks about that they can't
11  be -- it can't be coercive negotiations.  And Jamo
12  only applies until the discharge is received.  After
13  the discharge is received, they can no longer be
14  linked like that.  He also sent me In re Schmidt,
15  which again was a similar case, but was -- it was a
16  case during bankruptcy and not post-discharge.
17                In his e-mails, his e-mails,
18  especially that one, clearly show his stance that
19  they were demanding reaffirmation or foreclosure and
20  he -- his argument was that they were totally
21  justified in doing that even post-bankruptcy.  And it
22  shows that I wasn't the one that approached him about
23  this, that it was coming from them.
24                On April 26th, I sent him an e-mail
25  saying I disagreed with his case law and I disagreed

1  with the fact that the loan would be due because

2  under later case law, there's ipso facto clauses and

3  loans are no longer enforceable.  Just a bankruptcy

4  itself doesn't make -- they can't just call in a loan

5  due from the bankruptcy.  And on the 28th of April, I

6  get an e-mail pointing out the bank's threat to

7  reaffirm or foreclose.  Mr. Grossman responded

8  that -- to quote:

9            **[AS READ:**

10           **My client has no more patience in this**

11   **matter.  You have till Wednesday, 5:00 p.m. to make**

12   **your -- to make my client an offer.  If you do not**

13   **make an offer by that time, then I will have to**

14   **assume that no offer is coming and I will file my**

15   **foreclosure on Thursday morning.]**

16           At 4:51 on the afternoon of the

17  deadline, he sent me an e-mail which asked if I would

18  accept service on behalf of my client.  At -- before

19  I received that, I had submitted my offer to the bank

20  in response to their demand.  And I said that the

21  bank is in violation by making the threats, and that

22  we would be willing to, you know, refinance at five

23  and a half percent for 25 years but we would not

24  engage in any kind of reaffirmation.

25           Looking at the case law, I could see

1   that even at that point, a post-discharge, a

2   reaffirmation agreement would not have been

3   enforceable.  And I probably could have agreed to do

4   something, agreed to refinance alone.  And then

5   pointed out that the reaffirmation wasn't agreeable

6   but I kept it right out and said, you know, it's not

7   permitible [sic] -- permissible to do what he was

8   asking and so we couldn't do the reaffirmation.

9               And then a couple of weeks later, I

10  received an e-mail saying the bank had decided to

11  foreclose and again asked me if I would accept

12  service on behalf of my client.  And then over two

13  months went by.  I thought -- I concluded that it had

14  been just bluffing on their part, and -- but on

15  July 20 of 2012, Mr. Ameriks of the bank, another one

16  of the bank's attorney, did file a foreclosure

17  action.  And also in the demand in the foreclosure

18  was a demand for a deficiency judgment.

19              Also, I did miss one point.  Oh, when

20  I did say that I thought that -- I told them on

21  April 28th that I had told my client that I thought

22  the bank was bluffing and Mr. Grossman responded

23  that:

24              **[AS READ:**

25              **I wish I were bluffing.  You need to**

1     **make -- he said, you need to make an offer.]**

2                    And that's -- after that is when I

3     filed my motion to reopen the case and for sanctions.

4                    Now, in their version of the events,

5     Mr. Grossman tries to say that -- well, he doesn't

6     come out and say it, but he makes it sound like I am

7     the one who initiated the -- came to him with trying

8     to say, oh, you refinance for the -- and we'll

9     reaffirm the loan.  He hints at that.  He doesn't

10    really say it.  He tries to make the court believe

11    that that was me approaching him.

12                   Now, also in the affidavit of the bank

13    president, Suellen Long, she says in the -- her

14    statement that she was told to meet with her and

15    discuss the loans.  So she does admit that, well,

16    somebody higher up to her was telling her to contact

17    Ms. Kirkel and bring her in for a meeting about the

18    condo loan.  Again, a 524 violation.  Also, Ms. -- as

19    I pointed out earlier, she said that Ms. Kirkel gave

20    her my information at that time, which I don't

21    believe she'd ever heard of me before.  She --

22    immediately after the meeting, she called one of my

23    clients who then called her back with my information

24    and then she called me.

25                   Now, in the bank's statement, they say

1    that -- they said that I don't claim the bank was

2    seeking a personal deficiency judgment of

3    foreclosure.  Well, I do.  They have in the

4    foreclosure one of their things they're demanding is

5    a deficiency.  They also claim that there's no

6    damages.  My client, as I pointed out to them during

7    the discussions, while they were making their

8    demands, upset my client quite a bit.  She ended up

9    putting the property up for sale because she was in a

10   panic, having problems sleeping, didn't want to lose

11   the property.  It ended up having more value than any

12   of us realized, and she does have a -- she has

13   accepted an offer on it, so we are in the process of

14   completing the sale of the property.

15              And also like to point out on day one

16   of talking with them, they said they had case law,

17   which I don't think they would be arguing if it was

18   merely me approaching them.  They would have had no

19   need to do this, to mention that.  So basically what

20   they're doing is, you know, linking the two

21   impermissibly and going way beyond what's allowed.

22   And it seems like their statements are an attempt to

23   kind of match some case law that they found that, you

24   know, if we approach them, that it's okay to enter

25   negotiations post-bankruptcy, but that was not the

1    case.  And in terms of their filing the foreclosure

2    that they're now trying to say the two were not

3    linked, that it was just -- they were going to do

4    that anyway.  But they continued to accept payments,

5    you know, from after the discharge was granted.  In

6    fact, they're still accepting payments.  You know,

7    they're getting a good interest rate.  And if they

8    were just going to foreclose, why would they not just

9    foreclose?  You know, why would they have contacted

10   her except to make the links.  And this kind of stuff

11   is improper.

12                If you'll look at some of the other

13   case law in the Seventh District, you have the United

14   Airlines versus the International Machinists, where

15   the machinists were calling in sick to try and force

16   the company into speeding up negotiations.  And the

17   court ruled that, you know, yes, it's permissible for

18   people to be calling in sick, but when they're doing

19   it for an impermissible purpose, then that's not

20   something they can do.  And also in the United

21   Airlines versus the United Pilots, the pilots begun

22   refusing to pick up any overtime, were calling in

23   sick and were doing things that they didn't have to

24   do, but normally did.  And the court ruled that,

25   again, using something like that in an impermissible

1 way was not allowed.  And it even -- the appellate

2 court came down on the -- judge pretty hard and said

3 that, you know, the company should have -- the union

4 should have done something.  If the union didn't do

5 something, the company should have.  And if the

6 company didn't do something, it was incumbent on the

7 court to do something to protect the public from this

8 kind of -- that kind of behavior.  And the case law

9 is pretty clear.  The stuff they tried to use, the

10 Jamo case is only during -- during a bankruptcy.  It

11 doesn't apply post-bankruptcy, and the case law is

12 clearly that after the bankruptcy, they don't have

13 that -- really have that option again unless they

14 want to reopen the bankruptcy case and then proceed

15 under 524(c).

16    And so we're asking for Ms. Kirkel to

17 be awarded legal fees, to be awarded something for

18 her -- for their actions caused her to be panicky, to

19 sell the property at the low point of the market,

20 to -- I mean, her loss of sleep and her just, you

21 know, entering into her, you know, agreements under

22 duress which may not be in her best interests.  It's

23 hard to quantify such a thing because -- at this

24 point, but it's definitely there.

25    Also, after she -- this started -- her

1   tenant in her commercial building thought, well,

2   maybe the property is being foreclosed on, stopped

3   making her payments.  She had to go to court with him

4   to get him paying again.  He's still behind thinking

5   he may be able to gain some advantage with this.  And

6   I think the bank's behavior -- it was pretty clear

7   what they were doing.  Their excuses, I don't think,

8   are very believable.  And I think their behavior was

9   egregious.  And I think in this case punitive damages

10  should be awarded.  I mean, the case law is not very

11  clear in the Seventh Circuit, but there is some that

12  says inappropriate behavior -- appropriate

13  circumstances for egregious behavior that they would

14  be awardable.  We'd also -- the -- you know, we

15  almost reached settlement on this, but the problem is

16  they're still saying they want to foreclose on the

17  property because their position is though they never

18  linked the two.  But Ms. Kirkel needs some protection

19  if the sale doesn't occur as we hope it will or she's

20  not able to get another buyer, then she still has

21  their threats hanging over them, and that's why we're

22  unable to reach settlement on this.

23              THE COURT:  Thank you, Counsel.

24              MR. ROME:  Thank you, Judge.

25              I'll just first address some of the

1    statements made by counsel.  Early on he indicated

2    that the condo payments were made during -- the condo

3    payments made by his clients were made during the

4    bankruptcy and post-petition -- or, I'm sorry, after

5    the bankruptcy and after discharge.  Even the

6    documents he attached, they were made during the

7    bankruptcy after she had filed the statement of

8    intent to keep the property.  So making payments is

9    normal, and the bank should take those payments.

10                   He mentioned the first meeting with

11   the bank and his client.  And he said that was during

12   the bankruptcy.  Well, she made a statement that said

13   she wanted to keep this property.  There was no

14   lawyers present for Bridgeview.  It was a banker who

15   came in between the two clients, no lawyer present,

16   and asked her what her intentions were after they

17   filed.  She filed the intention to keep both of those

18   pieces of property.  Again, nothing wrong with

19   Bridgeview's conduct.

20                   He later talked about that she's

21   continuing to make payments.  Judge, this loan

22   matured in February of 2011.  Everything is due.  So

23   to say that she's current is just either incorrect or

24   a fabrication.  The whole loan became due in

25   February of 2011.  And we have a discharged debtor

1   against this property.  I don't really know what else

2   the bank can do.  He talked about the March 27th.

3   First off, there was no date in the affidavit.  There

4   is a lot of things that counsel is testifying to

5   right now.  A lot of things that he's bringing up

6   that aren't in his affidavit.  They're not sworn

7   before this court.  I think it's inappropriate for

8   this hearing.  Your Honor made it very clear that any

9   evidence should be in front of the court prior to

10  today's hearing.  And now counsel is going and

11  telling a story that he has that's not even in his

12  own affidavit.  But he brings up a date which was

13  nowhere to be found that there was a second meeting

14  between the bank on March 27th, after the discharge.

15  Well, if that's the case, on one hand, his client is

16  saying that she absolutely wants to renegotiate a

17  discharged debt on a commercial loan.  And she wants

18  to talk freely about that.  But, she doesn't want to

19  talk anything about the HELOC.  It's diametrically

20  opposing one another, Judge, if she's coming into the

21  bank and talking about something that she thinks is

22  inappropriate.  Plus, the affidavit that's before

23  Your Honor states that the bank did not talk to her

24  at all about any of the negotiations.  They wanted --

25  they found out she was represented by counsel and

1   that's when he may have a different story about

2   actually how it occurred.  But they reached out to

3   counsel to continue on these negotiations.

4            Counsel hasn't really brought up any

5   case law that talks about a bank being sanctioned for

6   negotiating with another attorney.  And that's all

7   that he's talking about.  He's talking about

8   negotiations between himself and the bank after a

9   discharge.  I haven't seen any cases like that.  He

10  hasn't brought any up.

11           Just to address other things he's

12  talking about here.  The deficiency judgment, I have

13  a copy of the foreclosure complaint, Your Honor, if

14  you'd like to see it.  They're not seeking a

15  deficiency judgment.  I'm sure Your Honor had a

16  chance to review --

17           THE COURT:  I've seen the complaint.

18           MR. ROME:  Okay.  So I don't -- again,

19  there's just things coming out that really don't make

20  any sense, at least from my perspective.

21           Punitive damages, we've provided the

22  case law on that.  There are no punitive damages,

23  so -- panicky?  I've never -- they have to have

24  actual damages.  Panicky, loss of sleep, and forcing

25  her to sell her property for a profit.  The bank has

1   every right to move to foreclose on a piece of

2   property they have.  A loan's matured.  They have no

3   borrower, and they have an in rem -- they have an in

4   rem lien against that property.

5               So after I addressed what he said, we

6   have really eight points that we'd like to make:

7   First, Bridgeview's foreclosure complaint did not

8   violate the discharge order at all.  Second,

9   Bridgeview's negotiations with debtor's counsel, so

10  his predecessor, during the bankruptcy did not

11  violate the automatic stay.  Third, Bridgeview's

12  negotiations with counsel, counsel standing to my

13  left, after the discharge did not violate the

14  discharge order.  Four, which I've addressed a little

15  bit earlier, accepting payments from the debtor for

16  the residential loan after debtor filed a statement

17  of intent to keep the property did not violate the

18  automatic stay.  Fifth, Bridgeview's in-house

19  counsel, Kevin Ameriks, did nothing to subject

20  himself to liability.  If anything, he may have a

21  counterclaim against Ms. Kirkel.  All he did was

22  inherit a file, see that there was no borrower, and

23  he filed a foreclosure.  He didn't reach out to her.

24  He didn't reach out to anybody else.  And there's

25  nothing in the record that shows anything different.

1   Six, Bridgeview's former in-house counsel Josh

2   Grossman was permitted to respond to counsel's direct

3   negotiations regardless of who negotiated first and,

4   therefore, did not violate the discharge order.

5   Seven, according to Judge Baer's opinion issued eight

6   days ago, in In re Richard Klarchek, this debtor

7   lacked standing to bring a cause of action for

8   violation of the automatic stay because such a claim

9   can only be made on behalf of the Chapter 7 Trustee.

10  That's a claim of the estate.  And eighth, the debtor

11  hasn't sustained any damages.

12            So I'd like to go through them all,

13  Your Honor, but I know Your Honor might be short on

14  time.  But if you would let me, I'd like to go

15  through all each eight of those.

16            THE COURT:  Let me cut part of this

17  short.

18            MR. ROME:  Okay.

19            THE COURT:  And that is with respect

20  to predischarged actions and whether or not those may

21  or may not have been violations of the automatic

22  stay, that shouldn't sail.  That's not something

23  that's properly before this court, and I'm not

24  considering that in any calculation of damages.

25  The -- I'm familiar with Klarchek.  I'm actually the

1  judge assigned to the Klarchek matter.  Judge Baer

2  was helping me out.  I'm well aware of the standing

3  issue.  But putting aside the standing issue, the

4  automatic stay is not at issue here.  The question

5  here is whether there's been a violation of the

6  discharge injunction.  And so any discussion with

7  respect to 362 and actions that took place prior to

8  the discharge insofar as they relate to 362 is simply

9  a waste of time at this point.

10            Now, actions prior to the discharge

11  are relevant to the extent that they show a course of

12  conduct that may or may not have been continued

13  afterwards, either to the benefit or to the detriment

14  of the respondent here.  So I'm happy to hear about

15  those actions in that context, but I don't need to

16  spend any time on 362.

17            MR. ROME:  Okay.  I will skip over

18  those parts then.

19            All right.  For the first, Judge,

20  we'll focus on Bridgeview's foreclosure complaint and

21  whether or not it violated the discharge order, which

22  clearly we think it doesn't.

23            A discharge order merely bars acts to

24  collecting mortgage debt as personal liability of the

25  debtor.  It does not prevent a creditor from

1   enforcing its mortgage lien against the mortgaged

2   property.  Section 524(a), which I know Your Honor is

3   well aware of, provides the discharge order operates

4   as an injunction against their commencement or

5   continuation of an action to collect, recover, or

6   offset any debt as a personal liability of the

7   debtor.  Section 524 does not provide that

8   prepetition liens are avoidable, nor does it bar a

9   creditor from pursuing in rem recovery against the

10  property of the debtor.

11               I'm assuming Your Honor would like me

12  to move forward, because I think we all know that we

13  could foreclose on this property.  Also, we pointed

14  out in the Redmond case, Your Honor, which is a 2010

15  Seventh Circuit case, the Seventh Circuit stated, and

16  I quote "never" -- well, it says the result

17  "according to the Seventh Circuit, a discharge order

18  can never affect a bank's right to foreclose on its

19  mortgage lien."  BBG, contrary to what counsel said,

20  is not seeking personal judgment against Kirkel, nor

21  is BBG taking -- Bridgeview -- I say BBG, Your Honor,

22  just clarification of the record, taking any other

23  action to recover amounts due under the commercial

24  loan as a personal liability of Kirkel.  Instead,

25  Bridgeview is merely seeking an in rem recovery

24

1  against its commercial property.  As such, Kirkel has

2  failed to provide any evidence, let alone clear and

3  convincing evidence, that Bridgeview's proposed

4  constitutes a violation of discharge order.

5  Additionally, contrary to Kirkel's motion, there's no

6  evidence that Bridgeview's filing of the foreclosure

7  is vindictive or lacks an economic purpose.

8          Kirkel insinuates in her motion that

9  the value of the commercial property is so depressed

10  that Bridgeview has no realistic hope of recovering

11  money from a judicial sale, thus the foreclosure is

12  vindictive.  Yet, Kirkel fails to supply the court

13  with any evidence to support her view of the

14  commercial value of the property.  In contrast,

15  Kirkel's counsel indicated both first to me and now

16  in front of Your Honor that she actually signed the

17  contract to sell the commercial property for a price

18  sufficient to pay off all liens against the property,

19  including Bridgeview's mortgage.  Thus, the

20  commercial property is clearly far more valuable than

21  Kirkel would like the court to believe, and therefore

22  there is a direct economic purpose for Bridgeview to

23  pursue a foreclosure action.

24          Under these circumstances, Kirkel

25  cannot maintain that Bridgeview filing the

1 foreclosure was merely vindictive and to force her to

2 pay off her residential loan.  There's clearly

3 another reason why, and it's an economic reason.

4                     Skip this part, Your Honor.

5                     What we had down as third, but, Your

6 Honor, Bridgeview's post-discharge communications

7 with Kirkel did not violate the discharge order.  At

8 the time of Kirkel's discharge, as counsel indicated,

9 Bridgeview held two outstanding loans in its books.

10 One was secured by the property owned by Kirkel, the

11 commercial property, and one was the residential.

12 Though both loans are in default, contrary to what

13 counsel has indicated, that loan matured on February

14 of 2011, it's attached to the complaint, attached to

15 the foreclosure complaint -- strike that.  It could

16 be 2012.  That loan has matured in its default.

17                     Kirkel, as counsel indicated,

18 continued to make payments, but those payments

19 stopped in October.  So even though she was making

20 what she believed were payments on a loan that's

21 already matured, those have even ceased.

22                     Kirkel continued to express intent or

23 interest through her counsel in entering into a new

24 post-discharge arrangement that would permit her to

25 at least retain the commercial property.  So we have

1 two debts that have been discharged, and she's at

2 least showing interest in keeping the commercial

3 property post discharge.

4            Under these circumstances, the

5 discharge order did not bar Bridgeview from

6 responding to Kirkel's inquiries by discussing

7 various possibilities and arrangements that would

8 permit Kirkel to retain the commercial property,

9 especially when all the discussions were initiated by

10 Kirkel's counsel.  And that's what the record

11 indicates.  The following is a direct quote from the

12 In re Henry case, Judge, that we cited on page ten of

13 our brief.  And it says:

14            **[AS READ:**

15            **If a debtor is represented by counsel,**

16 **any creditor may communicate with counsel from the**

17 **debtor without violating the automatic stay or the**

18 **discharge order.  Counsel has no need to be**

19 **shielded from a client's creditors.  It is part of**

20 **the job of counsel for debtor to deal with the**

21 **client's creditors.]**

22            So what counsel is indicating is that

23 he should be protected and any communication through

24 him is a violation of a discharge order.  Here, none

25 of Bridgeview's post-discharge communications with

1   Kirkel or her attorney violated the discharge order.

2   By all accounts, all of Bridgeview's post-discharge

3   communications regarding this matter were made to

4   Kirkel's attorney, not to Kirkel.  And Bridgeview

5   only responded to Kirkel's request for an arrangement

6   that would permit her to retain the commercial

7   property.

8           Initially, the post -- the parties'

9   post-discharge negotiations focused on an offer of

10   certain of Kirkel's friends to purchase one or more

11   of Bridgeview's REO properties in exchange for an

12   agreement that Bridgeview would enter into a new loan

13   with Kirkel.

14           And this reaffirmation keeps getting

15   bounced -- it wouldn't be a reaffirmation.  It would

16   be a new loan because that has already been

17   discharged.

18           Later when it became apparent that

19   Kirkel's friends would not be purchasing the REO

20   properties from Bridgeview, it was Kirkel's counsel

21   that first suggested that Kirkel might make voluntary

22   payments with respect to the residential loan as part

23   of a new loan agreement with Bridgeview.  That's what

24   the affidavit says; it's not contradicted.  However,

25   no agreement was ever reached between Bridgeview and

 1  Kirkel.  There are many possible legitimate forums

 2  that a post-discharge arrangement between Kirkel and

 3  Bridgeview might have taken place, such as voluntary

 4  payments on a new loan, permitting Kirkel to retain

 5  the commercial property.  Kirkel speculates that

 6  Bridgeview wanted the parties' negotiations to result

 7  in an agreement that violated the discharge order,

 8  but Kirkel could not provide any evidence to support

 9  her speculation.  Even Kirkel admits that no

10  agreement was ever reached between her and

11  Bridgeview.  And she does not claim that she actually

12  made involuntary payments on a discharged debt.

13  Again, Kirkel has failed to cite a single case where

14  a creditor was sanctioned for violating a discharge

15  order based on nothing more than mere negotiations

16  with debtor's lawyer.

17          Fourth, Your Honor, this is pre --

18  Kirkel's request for entering an order holding Kevin

19  Ameriks personally in contempt is baseless.  Ameriks

20  was not involved in any negotiations with Kirkel or

21  her attorneys either during or after the bankruptcy.

22  The only thing that Mr. Ameriks did was file a

23  foreclosure action, which was nothing more than a

24  legitimate attempt by Bridgeview to recover the in

25  rem judgment against the commercial property.

1  Counsel himself stated in his argument that he

2  thought that the matter had just gone way.  But now

3  when a new attorney picks up the file and does what

4  he should do, somehow he -- should he -- a lawsuit

5  should be filed against him and a motion for

6  sanctions?  It just isn't proper.  The foreclosure

7  action does not involve any attempt to recover

8  against Kirkel personally.  As such, there is no

9  evidence that would remotely provide a basis for

10  holding Kevin Ameriks personally in contempt for

11  violating the automatic stay or the discharge order.

12          Kirkel's request for an entry of an

13  order holding Joshua Grossman personally in contempt

14  is also misguided.  Although Grossman was involved in

15  the negotiation with Kirkel's attorneys, he never did

16  anything to violate the automatic stay or coerce

17  Kirkel to pay a discharged debt.  There's not one

18  shred of evidence or testimony that Josh Grossman

19  even spoke to Ms. Kirkel even once.  All

20  communications were through his counsel.  All of

21  Grossman's communications, again, were with Kirkel's

22  counsel.  Most of Grossman's communications involved

23  responding to inquiries from Kirkel's counsel and

24  none of Grossman's communications involved an

25  improper attempt to collect a discharged debt from

Case: 11-3727 Document: 21 Filed: 05/28/13 Pages: 54 Case: 1:11-cv-03921 Document #: 51 Filed: 05/26/13 Page 38 of 54 PageID #:441

Document     Page 30 of 46

30

1   Ms. Kirkel.  If there were negotiations going back

2   and forth, those were simply negotiations between

3   attorneys.  As such, there is no evidence that would

4   remotely provide basis for holding Grossman

5   personally in contempt for violating the automatic

6   stay or the discharge order.

7                   Lastly, Judge, the debtor has not

8   sustained any damages.  In a civil contempt

9   proceeding, which I know Your Honor is well aware

10  with for violation of discharge order or the

11  automatic stay, sanctions may only be imposed for two

12  purposes; namely, to coerce the defendant into

13  compliance; or two, to compensate the debtor for

14  losses sustained by the disobedience.  With regard to

15  the violation of the discharge order, a debtor may

16  generally recover for post-discharge payments, which

17  she's made none, and reasonable attorney fees

18  directly related to the litigation at issue.  The

19  debtor may not recover punitive damages in a civil

20  contempt proceeding and that's the Cox case, Your

21  Honor, which is the Seventh Circuit, 2001.

22                  In this case, Kirkel cannot possibly

23  establish that she suffered any losses relating to

24  any of the alleged misdeeds of Bridgeview or its

25  employees.  Kirkel does not allege that she made any

1   involuntary post-discharge payments with regard to

2   the residential loan, nor does she claim that any of

3   her attorney negotiations with Bridgeview ever

4   resulted in a final agreement of any kind.  In the

5   past, Kirkel's claimed that she feels compelled to

6   sell her commercial property rather than deal with

7   Bridgeview.  Yet, even if this were true, Kirkel does

8   not claim that she is suffering a loss from the sale

9   of the commercial property, nor does she assert that

10   she's selling the commercial property for less than

11   fair market value.  Moreover, according to her

12   attorney, again, Kirkel secured a sale of the

13   commercial property that will permit her to pay off

14   all the liens on the property for an undisclosed

15   amount of money.

16           Under the circumstances, it appears

17   that Ms. Kirkel's likely profiting from the sale of

18   the commercial property but refuses to disclose the

19   sales price because it's either in line with or

20   exceeds the fair market value.  Thus, Kirkel has

21   failed to establish that she suffered any losses due

22   to any actions taken by Bridgeview or its employees,

23   and she is prohibited from recovering punitive

24   damages in a civil contempt proceeding.  Kirkel may

25   have incurred some attorney fees in connection with

1  this matter, but none of those fees can fairly be

2  characterized as reasonable in light of Kirkel's

3  failure to establish any damages, not to mention her

4  failure to establish a single violation of the

5  automatic stay, which Your Honor has already

6  indicated, for the discharge order.

7            Thank you, Judge.

8            THE COURT:  Counsel, you get the last

9  word.

10           MR. CLOUTIER:  Okay.  When we first

11  came, I did mention the 362 violations, and my

12  understanding was that you would take that with the

13  rest of the evidence and so forth.

14           THE COURT:  Again, Counsel, to make my

15  comments clear.  To the extent that it evidences a

16  course of conduct that continued after the discharge

17  injunction was in place, then the pre-petition -- or

18  pre-discharge injunctions are relevant.  But I'm

19  not -- I'm not considering an award of damages under

20  Section 362.  The time for seeking that was prior to

21  the discharge being entered.  The court has continued

22  jurisdiction to enter 362 damages after the

23  discharge, but only if the action is brought before

24  the discharge itself is entered.

25           MR. CLOUTIER:  Okay.  All right.

1           He mentioned the first meeting being

2    banker initiated.  It's still a violation.  I mean,

3    they can't take any action to collect.  But I guess

4    that was -- that would be a 362 also.  But -- and he

5    tries to say that my affidavit didn't name the exact

6    date of the meeting.  But their affidavit does.  It

7    says specifically on March 27th they say the meeting

8    took place.  My client's affidavit talks about how

9    the meeting was initiated, that she was told to come

10   in to discuss the condo loan.  So the date's there.

11   And she was not represented by counsel at that

12   meeting.  So Ms. Kirkel's affidavit clearly talks

13   about what happened at the meeting, that she was told

14   she was going to have to pay something on the condo

15   loan.  They said they wanted $50,000 or they would

16   start the foreclosure.

17           The -- he repeatedly said that they're

18   not asking for any personal judgment in the

19   foreclosure action.  But, I mean, it's clearly in

20   here.  In their prayer for relief, item C, they're

21   requesting a personal judgment for deficiency to the

22   extent applicable.  So it's clearly in here, in their

23   demand for -- in their prayer for relief.

24           And in terms of actual damages, she

25   has had actual damages.  She had the attorney's fees

1  she's had to pay.  She's had problems with her tenant

2  who is worried that he was going to lose his -- not

3  be able to operate his business there because they

4  were going to start foreclosure.  So he began making

5  his payments, his rent payments sporadically and

6  she's had to take him to court.

7                And, again, they keep trying to stress

8  that I initiated the actions and the conversations;

9  that was not true.  I mean, it clearly looks like the

10  bank could not reach the attorney to get negotiations

11  going to try to collect on that -- the condo loan so

12  they had the bankers bring her in, threaten her, and

13  then told her to have the -- when they couldn't get

14  anywhere with her, they told her to get an attorney

15  and have him contact their attorney.

16                He talks about Mr. Ameriks, another

17  attorney for the bank, not being responsible, that he

18  just picked up the file.  Well, he was -- Mr. Ameriks

19  was involved in the bankruptcy.  It seems like he was

20  aware of what was going on.  The -- he either knew or

21  should have known about the threats as -- and, also,

22  in the foreclosure, like I pointed out, he did ask

23  for a personal deficiency judgment.

24                THE COURT:  Counsel, let me -- point

25  to me where it says that.

1            MR. ROME:  I can show you, Judge,

2  right here where it says --

3            THE COURT:  Just tell me the paragraph

4  number.  Because I'm looking at --

5            MR. ROME:  Mine is paragraph M, Judge,

6  on page three.  It says "no defendant remains liable

7  for any deficiency."

8            THE COURT:  I see that, but I want to

9  know where counsel is saying there's something --

10            MR. CLOUTIER:  In the prayer for

11  relief.

12            THE COURT:  Where in the prayer for

13  relief?

14            MR. ROME:  Section C, Your Honor, he's

15  referring to.

16            THE COURT:  To the extent applicable.

17            MR. ROME:  Exactly.

18            THE COURT:  All right.  Go ahead.

19            MR. CLOUTIER:  Now, they also point

20  out -- they're also trying to make it out like they

21  have no choice but to foreclose.  But if that was

22  true, why would they even be discussing doing a new

23  loan and on more favorable terms?  So obviously they

24  had the ability to do some kind of refinance with

25  Ms. Kirkel.

 1            Now, they bring out the Henry case,

 2   which says communications is okay.  And that may be

 3   true, but they went more beyond communication.  They

 4   were putting threats in there, do this or we're going

 5   to do this.  And the case law clearly says that they

 6   can't do that.  For some -- in In re Butler, the 2011

 7   case, it says that for something to be voluntary, it

 8   must be free from creditor influence or -- and that

 9   voluntariness [sic] is destroyed if the pressure is

10   brought to bear by the creditor.  And that's clearly

11   what is happening here was, you know, we're going to

12   take your commercial building if you don't pay the

13   discharged debt.

14            I think, you know, if you look at the

15   e-mails it's pretty clear.  You know, they initiated

16   this and they were -- they made an effort to try to

17   collect a discharged debt in violation of 524.  And

18   they also said no post-discharge payments on the

19   condo.  I believe there were a couple that were taken

20   afterwards.  After the discharge was received, they

21   continued to take payments and she even had to close

22   her account to stop that.  And they also point out

23   that she's making a profit on the building.  Well,

24   she's owned the building since 1994.  So, I mean, she

25   should make a profit if she sells the building.  It's

1  a -- you know, she's had a long-term ownership of the

2  building and I don't think that's unreasonable to

3  expect.

4         And he also says that I failed to

5  point out any case law of where without damages,

6  there were -- it's not a violation.  Well, I mean the

7  McClure case in Texas, I believe in 2010, where Sears

8  had hired a company to try and collect a discharged

9  debt without telling them it had been discharged.

10  All that happened in that case was that the

11  collection agency made phone calls and were

12  immediately told that the -- they filed bankruptcy

13  and the response of the collector was just to say

14  damn, and hang up.  And the court sanctioned Sears

15  quite heavily, I think in the area of 300,000 and

16  until they put in -- they lowered it later when Sears

17  put in procedures to stop that.  I guess it was a

18  repeated abuse of using that kind of tactics.

19         So I think what we have here is pretty

20  clear.  They wanted to try and collect on that

21  discharged loan.  They took action.  They had the

22  bankers call her in to make threats to her and to get

23  discussions going on her paying something for it.  I

24  think everything is pretty clear, clearly shows that.

25         THE COURT:  Okay.  All right.  So what

1  I'd like to do is this, which is I'd like to get just

2  a short recess so I can get my notes and my thoughts

3  together.  I pretty much had that before I came in,

4  but based on the comments of counsel, I need to

5  adjust a bit of that to make sure I'm clearly

6  understanding the issues.  And so it is

7  currently 2:33.  I'm going to take a recess

8  until 2:45.  We'll reconvene at that point.

9                 MR. ROME:  Thank you, Judge.

10                (Brief recess.)

11                THE COURT:  Okay.  Let's have counsel

12  at the lectern, please.  We're back here on the

13  Kirkel matter.

14                All right.  So I've taken the time to

15  take a look at the issues here.  And there are a few

16  points I'll raise just in the way of clarification.

17  And that is, first of all, I just want to put to rest

18  something that I think was misstated.  Counsel

19  attempted to use -- from Bridgeview, attempted to use

20  sort of a general application of law with respect to

21  civil contempt to find that in the context of a

22  discharge injunction violation, the punitive damages

23  are inapplicable.  The Seventh Circuit has actually

24  directly held that punitive damages in a discharge

25  injunction violation are applicable and that's the

1   Randolph versus IMBS case, a 2004 Seventh Circuit

2   case.

3                Now, having said that, I take a look

4   at this case a bit in reverse of what I would

5   normally do, which is what I would normally do is I

6   would get the facts at bar, I would ask myself, do I

7   see a violation.  I would work through the technical

8   aspects of that violation, and I would come to the

9   conclusion whether or not a violation exists.  And

10  then if one exists, take a look at damages.  But

11  let's, for the purposes of this case, do the

12  opposite.  Let's start with the damages and work our

13  way backwards.  And that is because the court is

14  having a hard time finding damages here.  The damages

15  that have been alleged by the debtor almost

16  exclusively arise out of acts that could have taken

17  place without a violation of the discharge

18  injunction, and that is the foreclosure on this loan.

19  Virtually all of the damages alleged have to do with

20  the distress of the debtor, the potential financial

21  impact of going through a sale in lieu of the

22  foreclosure and items such as that.

23                The court perceives those as being

24  damages that would be incurred if a simple

25  foreclosure action was brought and no negotiations

1   had taken place with respect to the discharged

2   personal liability of this debtor.

3                    Now, having said that, what that says

4   to me is did the foreclosure action in and of itself

5   give rise to damages?  No.  The foreclosure action in

6   and of itself was not a violation of the discharge

7   injunction.  The bank is within its rights to bring a

8   foreclosure action.  However -- there's always that

9   however, it seems.  However, I have a problem with

10  the complaint that was filed in this case.  All

11  right?  The complaint that was filed in this case

12  appears to me to be artfully crafted so that it

13  reserved the right to seek personal damages but put

14  in a savings clause such that if they were caught, if

15  Bridgeview Bank was caught seeking personal damages

16  against -- personal liability against this debtor,

17  they get to claim that they weren't really doing

18  that.  There's no legitimate reason to put the

19  request in the complaint the way it was put if this

20  bank was not hoping for the possibility of a judgment

21  of personal liability against this debtor.  There is

22  absolutely no reason to put it in the way it was put

23  in.  It was put in there twice.  It was put in in the

24  recitation of where it says that no defendant remains

25  liable on this personally absent a ruling of a court

1    of competent jurisdiction.  There's your savings

2    clause in the opposite direction, which is, oh, by

3    the way, court, you might be the court of competent

4    jurisdiction that can make that determination.

5                    Counsel, I'm not accepting argument on

6    this.  And in the prayer for relief.  And in the

7    prayer for relief, again, it says, I'm seeking

8    personal judgment except to the extent that that is

9    inappropriate.  Again, that -- it could just be poor

10   drafting.  I'll give you that.  Complaints get reused

11   over and over again.  Yet that poor drafting happened

12   to happen in a case where there is a discharge

13   injunction.

14                   And so I do find that the -- that

15   aspect of the foreclosure action is inappropriate and

16   is in violation of the discharge injunction.  But

17   that violation is de minimis at best.  I cannot see

18   evidence that gives rise to the fact that the

19   negotiations in any way exacerbated that particular

20   issue, that the negotiations centered around the

21   complaint seeking personal judgment.  I don't see

22   that that in and of itself really independently stood

23   for anything other than the fact that this bank did

24   something that it shouldn't have done.  The

25   negotiations around the debt, let's be clear on this,

1    counsel have talked back and forth about what the

2    case law is regarding the negotiations on the debt.

3    And there is, in fact, case law that talks about how

4    parties can negotiate prior to the entry of a

5    discharge regarding the trade-off between debt that

6    is dischargeable and a debt that isn't, and the

7    reaffirmation of certain debt.  And there are some

8    clear case law that says that that type of

9    negotiation is not a violation of the automatic stay.

10    Clearly, that sort of negotiation took place here

11    prior to the entry of the discharge.  The

12    continuation of such negotiations after the entry of

13    the discharge in the context of an otherwise

14    righteous or further action is not, in my mind, a

15    violation of the discharge injunction.

16                There is, in fact, a clear case on

17    this issue and it had to do with this pure discharge

18    issue, and that is -- excuse me a moment.  The

19    Heirholzer case out of the Northern District of Ohio.

20    That's 170 B.R. 938, and it had to do with a

21    post-discharge foreclosure action, and whether the

22    negotiations with respect to that foreclosure action

23    constituted adequate consideration for a debtor with

24    a discharged debt to consider reaffirming, or

25    reinstating or doing something with respect to that

1  debt in exchange for the lender forbearing from

2  foreclosing on this debt.  And the court in that case

3  found that it was, in fact, adequate consideration

4  under the negotiations.

5          It brings us back to a very salient

6  point in bankruptcy, and that is this:  Nothing

7  requires a creditor to extend new debt to a debtor

8  who has filed for bankruptcy.  In this instance, the

9  past course of conduct on this loan is not in any

10  way, shape or form controlling on the parties' future

11  actions.  The fact that the loan -- the note was

12  coming due on a yearly basis and was, in fact,

13  customarily renewed doesn't obligate this lender to

14  continue to renew the note.  As a matter of fact,

15  structuring a loan with a mortgage that goes out 20

16  years but with notes coming due every year is a tried

17  and true cautionary tactic by lenders to make certain

18  that there is, in fact, an obligation that comes due

19  and can be collected under certain circumstances.

20          So it's not unfamiliar and it's not

21  impermissible.  The note had come due.  The right to

22  foreclose appears to have existed.  The fact that

23  this lender was unwilling to extend the note, except

24  in the context of a -- not a reaff -- we keep using

25  the term reaffirmation, but some sort of agreement to

1  repay discharged debt is not to this court a per se

2  violation of the discharge injunction because as in

3  the Heirholzer case, this lender's forbearance from

4  foreclosing is in fact a valid consideration to be

5  traded against such negotiations.

6           Now, again, I find that this lender

7  could have and did in fact foreclose upon this

8  action, found the foreclosure as deficient though

9  because of the -- because of the particular clause in

10 the complaint.  I find no actual damages in this

11 matter other than counsel's fees with respect to the

12 matter, but I also find that counsel's fees, with

13 respect to this matter, are too much with respect to

14 the issue in question.  And, that is, it's clear that

15 a fair amount of time was spent pursuing causes of

16 action that are not viable and that counsel admits

17 that he's not a bankruptcy lawyer.  And I understand

18 that, but that the -- under the circumstances, the

19 issues could have been drilled down upon much more

20 quickly and much more efficiently.

21           So what I'm willing to do in this

22 matter is award $4,000 in attorney's fees.  Nothing

23 more.  No other actual damages and no punitive

24 damages in this instance.  I find that the public

25 finding on the record that Bridgeview had violated

1   the discharge injunction is sanction enough.  I find

2   that the other alleged actual damages are damages

3   that are not a cognizable injury from this particular

4   violation of the discharge injunction.

5               So that is the court's ruling with

6   respect to the matter before it today.  Do either of

7   the parties have any question on the court's ruling?

8               MR. ROME:  No, Your Honor.  Just for

9   clarification, is now the bankruptcy has been opened,

10  are we closing it so that we don't have any issues

11  with the state court matter?

12              THE COURT:  I will close it upon

13  verification that the damages have been paid.  If --

14  once the damages have been paid, what I would ask

15  happen is the party who wish -- obviously wants this

16  closed, which is Bridgeview Bank, deliver a notice

17  that says they paid the damages in question.  All

18  right?  And thereby are requesting that the court

19  close the case.

20              MR. ROME:  In a motion, Your Honor, or

21  just an order dropped off?

22              THE COURT:  I think you can just drop

23  off the order, but you have to have a verification

24  that you have, in fact, paid -- satisfied the

25  judgment in this matter.  I will enter judgment today

1   on this with respect to this amount, and I think

2   there's actually a provision in the bankruptcy rules

3   regarding satisfaction of judgments and how to do

4   that.  So just take a look at that.

5                    MR. ROME:  Thank you, Judge.

6                    MR. CLOUTIER:  Thank you, Your Honor.

7                    THE COURT:  Any other questions?

8                    (No response.)

9                    MR. ROME:  Thank you, Judge.

10                   THE COURT:  All right.  Thank you.

11                   (Which were all the proceedings had in

12                   the above-entitled cause, February 6,

13                   2013, 1:30 p.m.)

14  I, NICOLE ABBATE, DO HEREBY CERTIFY
    THAT THE FOREGOING IS A TRUE AND ACCURATE
15  TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
    ENTITLED CAUSE.

16

17

18

19

20

21

22

23

24

25